**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**TIMOTHY HARVEY,**

      **Plaintiff,**

vs.                                                                                                        **Case No. 8:04-CV-1748-T-EAJ**

**CITY OF BRADENTON, FLORIDA,**

      **Defendant.**

_____/

**ORDER**

Before the court are Plaintiff's Motion for Summary Judgment (Dkt. 16), Defendant's Response (Dkt. 20), Defendant's Motion for Summary Judgment (Dkt. 17), and Plaintiff's Response (Dkt. 19). Upon consideration, Plaintiff's Motion (Dkt. 16) is **DENIED** and Defendant's Motion (Dkt. 17) is **GRANTED** in part and **DENIED** in part.[1]

**I.    Introduction**

Plaintiff Timothy Harvey ("Harvey") brings this action pursuant to 42 U.S.C. § 1983 ("§ 1983") and alleges that Defendant, City of Bradenton ("the City"), retaliated against him and deprived him of the rights of free speech and association guaranteed by the First Amendment of the United States Constitution and Article I, Sections 4 and 5, of the Florida Constitution. (Dkt. 1). Harvey, an officer with the City of Bradenton Police Department, states that because he actively supported Bill Evers' mayoral campaign, the City repeatedly failed to promote and effectively demoted Plaintiff. (Dkt. 1 at 2-3). The City asserts that its actions were motivated by legitimate,

---

[1]On October 19, 2005, the parties consented to the undersigned having jurisdiction over this case pursuant to 28 U.S.C. § 636(c). (Dkt. 22).

non-discriminatory reasons and that it would have made the same decisions in the absence of any alleged discrimination. (Dkt. 5 at 2). The parties have filed cross motions for summary judgment.

## II.     Factual Background

In October 2003, Harvey was employed as a police officer with the rank of Corporal on the City of Bradenton Police Department. At that time, Michael Radzilowski was the Chief of Police; he was appointed by Mayor Wayne Poston in December 2002.[2] (Dkt. 15, Deposition of Michael Radzilowski (hereinafter "Radzilowski") at 4, 27). In the hotly contested 2003 Bradenton mayoral election, Harvey campaigned for Bill Evers, a former mayor of Bradenton, rather than the incumbent Mayor Poston. (Dkt. 18, Deposition of Wayne Poston (hereinafter "Poston") at 5). Mayor Poston was aware of Harvey's support for his opponent. (Id.) Chief of Police Radzilowski was also aware of Harvey's political support for Bill Evers; Chief Radzilowski states that he "became aware [Harvey] was supporting the other side." (Dkt. 18, Radzilowski at 19).

During the campaign, Harvey made a statement on a local news program about there being "morale issues" at the police department. (Dkt. 18, Deposition of Timothy Harvey (hereinafter "Harvey") at 50). Harvey also talked to "a lot of people" about his dissatisfaction with management and low morale at the police department. (Dkt 15, Harvey at 51-52). Harvey participated in a sign-holding event for Bill Evers held close to election day; Harvey was off-duty at the time and wore a black tee-shirt that read "POLICE" across the front. (Dkt. 18, Harvey at 30-31). Other police officers held signs for Mayor Poston's campaign at the same event. Id. At the sign-holding event, Harvey and Mayor Poston's wife had a verbal exchange about the validity of a sign Mayor Poston's

---

[2] The Bradenton Chief of Police is appointed by and serves at the pleasure of the Mayor of Bradenton. (Dkt. 15, Radzilowski at 5).

wife was holding that read, "The International Union of Police Associations Supports Poston." (Dkt. 18, Harvey at 30-31). The incident was investigated through an administrative inquiry and resulted in a finding that Harvey's actions did not violate any police policy or directive. (Dkt. 18, Radzilowski at 31-35). Mayor Poston won the election in November 2003.

In December 2003, the Bradenton Police Department eliminated the rank of Corporal in accordance with the Police Benevolent Association's collective bargaining agreement with the City. (Dkt. 16 at 5 n.7; Dkt. 17 at 17). Bradenton's City Council allowed Mayor Poston to reapportion the six Corporal slots to Sergeant slots. (Dkt. 15, Radzilowski at Ex. 5). Under general promotion procedures, individuals who were interested in promotions took a promotional examination and were ranked on a list. (Dkt. 15, Radzilowski, Ex. 1). The most recent list prior to December 2003 was issued on August 31, 2003. (Dkt. 15, Tokajer Affidavit). Harvey was ranked number four on that list. (Dkt. 18, Harvey at 15). In addition to the test scores, candidates for promotion were chosen based on supervisor recommendations. (Dkt. 15, Radzilowski at 13).

To complete the promotions, Chief Radzilowski presented recommendations for specific candidates for promotion to Mayor Poston. (Dkt. 18, Poston at 7). Mayor Poston asserts that he has final review and approval power over who is promoted to sergeant, although he has not in the past overruled a promotion recommended by Chief Radzilowski. (Dkt. 18, Poston at 7). Chief Radzilowski states that he himself is the final decisionmaker with regard to promotions to the sergeant position.[3] (Dkt. 18, Radzilowski at 27).

---

[3]Chief Radzilowski avers that he does not know whether Mayor Poston has the authority to veto one of the Chief's selections for promotion. (Dkt. 18, Radzilowski at 27-28).

On December 2, 2003, six officers other than Harvey were promoted to Sergeant. (Dkt. 18, Harvey at 20). The officers promoted were ranked 1, 2, 3, 5, 6, and 7 on the list of eligible candidates.[4] Id. Of the four officers (including Harvey) who held the rank of Corporal at the time, three were promoted to Sergeant. Id. at 22. The Corporal rank was eliminated and Harvey was reclassified as a Patrol Officer. (Dkt. 15, Harvey at 56-57). Harvey was directed to turn in his Corporal badge, remove the Corporal stripe from his uniform, and return his take-home vehicle. (Dkt. 18, Harvey at 68, 74). This reclassification of his position resulted in no loss of pay. (Dkt. 15, Collective Bargaining Agreement, Art. 22, § 7).

Upon learning that he had not received a promotion, Harvey met with his immediate supervisor Lieutenant Campbell and next higher ranking officer, Captain Vorva. (Dkt. 18, Harvey at 70). Vorva indicated to Harvey that if he "stuck his nose to the grindstone," and the Chief's opinion of Harvey changed, he would have the possibility of being promoted in the next round of promotions scheduled for June of 2004. (Dkt. 18, Campbell at 8).

Harvey then met with Chief Radzilowski to discuss the failure to offer Harvey a promotion. (Dkt. 15, Radzilowski at 23). At that meeting, Chief Radzilowski said he would not be able to have Harvey's promotion approved by Mayor Poston based on everything that had occurred. (Dkt. 18, Harvey at 90; Radzilowski at 24). Plaintiff alleges that Chief Radzilowski viewed Harvey's support of Bill Evers as "a direct attempt to get [Radzilowski] fired." (Dkt. 18, Harvey at 90). Plaintiff asserts that Chief Radzilowski told Plaintiff he had "fucked up" and "stepped on his dick," and that Plaintiff had "participated in a revolt and lost." (Dkt. 18, Harvey at 90). Plaintiff claims that at the

---

[4] Harvey was ranked number 4 on the list. (Dkt. 18, Harvey at 15).

meeting Chief Radzilowski stated, "You couldn't just support Bill Evers. You and a few others had to be way out in front."  (Dkt. 18, Harvey at 92).

A few months later, in early 2004, Chief Radzilowski interviewed Harvey for possible promotion in June 2004.  (Dkt. 18, Harvey at 16).  Plaintiff asserts that during that interview, Chief Radzilowski reiterated that he felt Harvey's support of Evers was a personal attack on him.  (Dkt. 18, Harvey at 18).  In June 2004, Harvey was ranked first on the list of candidates based on the promotion examination, but was again passed over for a promotion to the position of Sergeant.  (Dkt. 18, Harvey at 21).  Harvey was, however, promoted from Patrol Officer to Master Patrol Officer as part of the June 2004 promotions.  (Dkt. 15, Affidavit of Tokajer at unnumbered 2).  In March 2005, Chief Radzilowski recommended Harvey for promotion; Harvey was promoted to Sergeant effective March 10, 2005.  (Dkt. 17 at 8).

Harvey filed his complaint with this court on July 29, 2004, stating claims for violations of the right to free speech and association guaranteed by United States Constitution and the Florida Constitution, and invokes this court's jurisdiction under 42 U.S.C. § 1983, among others.  (Dkt. 1).  Harvey filed a motion for summary judgment on August 15, 2005 (Dkt. 16), and the City responded on September 1, 2005 (Dkt. 20).  The City filed a cross-motion for summary judgment on August 15, 2005 (Dkt. 17), and Harvey responded on August 29, 2005 (Dkt. 19).  Harvey argues, in essence, that the City's failure to promote him and *de facto* demotion constitute unlawful retaliation based on Harvey's protected political speech in campaigning for Bill Evers.  The City disputes this and asserts that Harvey did not engage in protected speech, that protected speech did not motivate the City's employment decisions, that Harvey did not suffer an adverse employment action, and that Harvey did not show that an official policy or custom caused his injury.

**III.     Applicable Standards**

The court may grant a motion for summary judgment only when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Initially, the moving party bears the burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If this initial burden is met, the burden shifts to the non-moving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. Id. at 324.

At the summary judgment stage, the court will not weigh the evidence or make findings of fact. Morrison v. Amway Corp., 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to determining whether there are genuine fact issues for trial. There is a genuine issue for trial when there is sufficient evidence upon which a reasonable juror could find for the non-moving party, and substantive law determines which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003). For purposes of summary judgment, all reasonable inferences are drawn in the non-movant's favor. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1280 (11th Cir. 2004).

**IV.     Discussion**

To maintain a cause of action under 42 U.S.C. § 1983, a plaintiff must establish that: (1) he or she suffered a deprivation of rights, privileges or immunities secured by the Constitution and/or laws of the United States; and (2) the act or omission causing the deprivation was committed by a

6

person acting under color of law. Wideman v. Shallowford Cmty. Hosp., Inc., 826 F.2d 1030, 1032 (11th Cir. 1987). In the instant case, Harvey alleges that the City's failure to promote him was in retaliation for Harvey's exercise of his constitutional rights of free speech and association, and that Mayor Poston and Chief Radzilowski were acting under color of state law. (Dkt. 16 at 11). The City disputes both these contentions. The court will first address Harvey's alleged constitutional deprivation.

### A. First Amendment Retaliation

To establish a claim for retaliation in violation of the First Amendment, a public employee plaintiff must show that the public employer took an adverse employment action against him because of the employee's constitutionally protected speech. Stavropoulos v. Firestone, 361 F.3d 610, 618 (11th Cir. 2004) (citing McCabe v. Sharrett, 12 F.3d 1558, 1564 n.3 (11th Cir. 1994); Goffer v. Marbury, 956 F.2d 1045, 1049 n.1 (11th Cir. 1992)); see also Bennett v. Hendrix, 423 F.3d 1247, 1252 (11th Cir. 2005). As a threshold issue, the court first considers whether Defendant took any adverse employment action against Plaintiff.

Plaintiff contends that he suffered adverse employment actions when Defendant denied him promotions in December 2003 and June 2004. Plaintiff also argues that when he was denied a promotion in December 2003, the elimination of the Corporal rank at the same time resulted in a demotion to Patrol Officer with the attendant loss of rank, status, and benefits such as a take-home car. (Dkt. 16 at 4-6; Dkt. 19 at 2). Defendant maintains that it did not take an adverse employment action against Harvey because Harvey lost no pay or benefits when he was passed over for promotion to a Sergeant position, and that relinquishing his Corporal badge and take-home car are not adverse employment actions. (Dkt. 17 at 17-18). Defendant maintains that the position of Patrol

Officer has essentially the same responsibilities as Corporal. (See Dkt. 15, Ex. 12 Procedural General Order 109).[5]

An adverse employment action in a First Amendment retaliation case is one that involves "an important condition of employment." Stavropoulos, 361 F.3d at 619. Discharges, demotions, refusals to hire or promote, and reprimands are important conditions of employment as a matter of law. Id. (citing Goffer, 956 F.2d at 1049 n.1). It is undisputed that Defendant twice failed to promote Plaintiff to Sergeant, in December 2003 and June 2004. These two instances fall squarely in the category of adverse employment actions for purposes of a First Amendment retaliation claim. See also, Bickel v. Burkhart, 632 F.2d 1251, 1255 n.6 (5th Cir. Unit A 1980) (fire chief's decision not to promote a firefighter in retaliation for the firefighter's negative public comments about the fire department was an adverse employment action).

In addition, Plaintiff asserts a third instance of an adverse employment action. Plaintiff contends that the City's removal of the rank of Corporal in conjunction with the failure to promote Plaintiff in December 2003 effectively demoted Plaintiff to the lower rank of Patrol Officer. (Dkt. 16 at 6 n.8). It is undisputed that at the time of his reassignment, Plaintiff was required to turn in his Corporal badge and relinquish his take-home car. Defendant focuses on the fact that Plaintiff's reassignment did not lower his pay. However, "if an employer's conduct negatively affects an employee's salary, *title, position, or job duties*, that conduct constitutes an adverse employment action." Akins v. Fulton County, Ga., 430 F.3d 1293, 1300 (11th Cir. 2005) (emphasis added).

---

[5]Procedural General Order 109.46 states that Corporals shall have all the responsibilities of Patrol Officers, plus the added responsibilities of filling the position of Acting Sergeant when necessary and actively patrolling housing developments and residential areas. Plaintiff points out that before the Corporal position was eliminated, Corporals had supervisory authority in some police zones. (Dkt. 19 at 2, citing Dkt. 17 at 3-4).

When Plaintiff was reassigned from Corporal to Patrol Officer, he lost a rank in the chain of command, the title of Corporal, and the duty to take over as Acting Sergeant when necessary. Likewise, being stripped of the benefit of a take-home car certainly involves an "important condition of employment." Plaintiff has provided sufficient evidence for a reasonable jury to conclude that Harvey's reassignment from Corporal to Patrol Officer constitutes an adverse employment action, and thus has made the requisite showing to avoid summary judgment on this issue.

Finally, Plaintiff contends that Defendant's denial of Plaintiff's training requests for several months is a fourth adverse employment action in retaliation for Plaintiff's protected speech. (Dkt. 16 at 7). Plaintiff does not provide any legal support for the proposition that denial of training requests can constitute an adverse employment action. This conduct, in contrast to reassigning Plaintiff to a lower rank, does not affect Plaintiff's salary, title, position, or job duties. See Akins, 430 F.3d at 1300. Neither does Plaintiff present any evidence that the training denied was an important condition of employment. See, i.e., Stavropoulos, 361 F.3d at 619. Plaintiff bears the burden of producing evidence that an action is an adverse employment action, and has not met this burden. See id. at 618. Therefore the court agrees with Defendant that the denial of Plaintiff's requests for training was not an adverse employment action for purposes of Plaintiff's First Amendment retaliation claim and grants Defendant summary judgement to that extent.

The court now turns to the core of Plaintiff's First Amendment retaliation claim: that the adverse employment actions were taken was in response to Harvey's constitutionally protected speech.

Generally, a public employer may not retaliate against a public employee for speech protected under the First Amendment. Braswell v. Board of Regents, 369 F.Supp.2d 1362, 1368

(N.D. Ga. 2005) (citing Rankin v. McPherson, 483 U.S. 378, 383 (1987)). However, the "public employee's right to freedom of speech is not absolute." Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989). A public employee's speech is constitutionally protected if the employee's First Amendment interests in commenting on matters of public concern outweigh the government's interest in promoting efficiency. See generally Connick v. Myers, 461 U.S. 138 (1983); Pickering v. Board of Education, 391 U.S. 563 (1968); Maggio v. Sipple, 211 F.3d 1346, 1351 (11th Cir. 2000).[6]

In Bryson, the Eleventh Circuit described the four-part analysis used to evaluate a public employee's first amendment retaliation claim. 888 F.2d at 1565-66. The court first determines whether the employee's speech is fairly characterized as constituting speech on a matter of public concern, considering the content, form, and context of the speech. Id. If the speech addresses a matter of public concern, the court then weighs the employee's first amendment interests against the state's interest in promoting efficiency in providing public services, taking into account the context and circumstances of the speech. Id. If the employee's interests prevail, the fact-finder then determines whether the speech played a substantial part in the government's decision to demote or discharge the employee. Id. Finally, if the fact-finder determines the speech was a substantial motivating factor in the employment decision, the state must prove by a preponderance of the evidence that it would have reached the same decision regardless of the protected conduct. Id.

---

[6] The Pickering-Connick test is used for cases that involve an employee's right of expression; an Elrod-Branti analysis is appropriate for "raw political patronage" cases where employees are discharged *en masse*. Terry v. Cook, 86 F.2d 373, 375-77 (11th Cir. 1989); Stough v. Gallagher, 967 F.2d 1523, 1527 (11th Cir. 1992) (cases involving the "overt expression of ideas" or political speech require the Pickering analysis). Here, Plaintiff does not allege a political patronage claim.

In the case at hand, the parties dispute whether Harvey engaged in protected speech and disagree at each step of the Bryson analysis. The first two prongs under Bryson are matters of law and therefore appropriate for the court to determine on a motion for summary judgment. See Arenal v. City of Punta Gorda, Fla., 932 F.Supp. 1406, 1412 (M.D. Fla. 1996). The latter two prongs concern the City's motivation for acting, an issue of fact.

### 1. Was Harvey's speech on a matter of public concern?

For speech to be considered speech on a matter of public concern, it must relate to a matter of political, social, or other concern to the community. Maggio, 211 F.3d at 1351-52 (citing Connick, 461 U.S. at 146). The court must consider the "main thrust" of the employee's statements in light of the content, form, and context of the speech. Id. at 1352 (citing Morgan v. Ford, 6 F.3d 750, 754-55 (11th Cir. 1993); Connick, 461 U.S. at 147-48). "Political speech addressing public issues or candidates running for public office invariably address matters of public concern because it is 'the unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" Stough v. Gallagher, 967 F.2d 1523, 1527 (11th Cir. 1992) (quoting Roth v. United States, 354 U.S. 476, 484 (1957)).

In this instance, Plaintiff's speech supporting Bill Evers' campaign took place in a public forum and concerned politics and candidates running for political office, matters "at the core of activity protected by the First Amendment." Beckwith v. City of Daytona Beach Shores, Fla., 58 F.3d 1554, 1564 (11th Cir. 1995). It included his participation in the sign-holding event, occurred during Plaintiff's off-duty hours, was on a public platform before potential voters, and during a period when voters were seeking information on mayoral candidates. See Stough, 967 F.2d at 1529. Plaintiff's speech supporting Bill Evers' candidacy constitutes speech on a matter of public concern.

11

Plaintiff's speech about the direction the Bradenton Police Department was taking was also speech on a matter of public concern. The content of Plaintiff's speech – the morale and functioning of the police department – is a legitimate subject of concern to the community. Plaintiff spoke about the matter on a local television broadcast during the political debate surrounding the mayoral election. (Dkt. 15, Harvey at 49-5). The form and context are evidence of Plaintiff's intent to inform the public as part of the public discourse. There is no evidence in the record that Plaintiff's comments involved a personal dispute rather than a public concern. See Brochu v. City of Riviera Beach, 304 F.3d 1144, 1158 (11th Cir. 2002) (a critique of management may be a matter of public concern); cf. Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1288 n.13 (11th Cir. 2000) (personal complaints contained in allegations of wrongdoing within a public agency may not be speech on a matter of public concern). Considering the content, form and context of Plaintiff's speech, including participation at a sign-holding event and speaking on television about the morale of the police department, the main thrust of Plaintiff's speech can be fairly characterized as constituting speech on a matter of public concern at this stage of the proceedings.

### 2. Balancing each party's interests

At the second stage of the Bryson analysis, the court must weigh Plaintiff's First Amendment interest in freedom of expression against Defendant's interest in promoting the efficiency of the public services it performs through its employees. Bryson, 888 F.2d at 1566 (citing Pickering, 391 U.S. at 568). When evaluating the government's interest in the efficient provision of public services, the court should consider: "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time, and place of the speech, and (3) the context within which the speech was made." Bryson, 888 F.2d at 1567. If the employee's speech

interferes with work, personnel relationships, or the employee's job performance, it hinders the government's interest in effective functioning of the public employer's enterprise. Rankin, 483 U.S. at 388. When the public employer is a police department, the state's interest may be especially compelling. Waters v. Chaffin, 684 F.2d 833, 836 (11th Cir. 1982). The court should consider the "heightened need for order, loyalty, morale, and harmony" in a law enforcement agency. Oladeinde v. City of Birmingham, 230 F.3d 1275, 1293 (11th Cir. 2000). However the state's interests are not absolute: "'To the extent that being a policeman is public employment with unique characteristics, the right of the employee to speak . . . may be more or less limited. It is not, however, destroyed.'" Chaffin, 684 F.2d at 836 (quoting Muller v. Conlisk, 429 F.2d 901, 904 (7th Cir. 1970)).

Defendant argues that the police department's heightened need for order, loyalty, morale, and harmony outweighs Plaintiff's First Amendment interest and cites Caruso v. City of Cocoa, Florida, 260 F.Supp.2d 1191, 1209 (M.D. Fla. 2003) as support. (Dkt. 17 at 14). Caruso involved a law enforcement officer who was engaging in an extramarital affair with the spouse of a subordinate officer. 260 F.Supp.2d at 1209. The court held that such behavior could undermine the trust of both the public and fellow officers. Id. However, the freedom to associate with the spouse of a subordinate at issue in Caruso is not comparable to the political speech Plaintiff engaged in here.

Defendant also cites Brochu, 304 F.3d 1144, in its argument that Defendant's interests outweigh Plaintiff's interests. (Dkt. 17 at 14-15). In Brochu, the plaintiff, a police officer, was "a major player in the creation and dissemination of a virtually secret plan to overthrow the existing police administration and put himself and his friends in charge." 304 F.3d at 1158. The court emphasized that the officer was not commenting on the ability of his superiors or any alleged

13

corruption in the department, "nor was he merely publicly campaigning in favor of candidates he felt would support a reform agenda." Id.

By contrast, in the case currently before the court, Harvey was participating in a public campaign and there is no evidence in the record to suggest that Harvey was involved in any sort of secret plot to overthrow the administration.[7]

Plaintiff's interest in voicing his political support for a particular candidate "occupies the core of the protection afforded by the First Amendment." See McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 346 (1995). When an employee's speech more substantially involves matters of public concern, a stronger showing of government interest may be necessary. Connick, 461 U.S. at 152. Plaintiff's interest in informing the public about the candidates in an upcoming election and morale at the police department communicated a matter of public concern. There is no evidence indicating that Plaintiff's remarks had (or could have had) a deleterious effect on the efficiency of Defendant's police department.[8]

---

[7] In addition, Defendant discusses Waters v. Churchill, 511 U.S. 661 (1994), regarding the weight given to employer predictions of disruption due to employee speech. (Dkt. 17 at 13-14). The Court in Churchill discusses prior restraints on public employees' speech and the government's reasonable predictions that the speech will cause disruption, neither of which are at issue in this case. 511 U.S. at 673. Even if Churchill were applicable, the government would have had to show that Harvey's speech was likely to be disruptive before it was punished. Id. at 674 (citations omitted). From the evidence in the record in this case, many Bradenton police officer participated in the 2003 mayoral campaign on both sides. (Dkt. 15, Harvey at 24, 31-32). Defendant has not shown that it reasonably predicted Plaintiff's political speech and campaign activities were likely to be disruptive.

[8] See Pickering, 391 U.S. at 570 (noting that no evidence of an adverse effect on efficiency was introduced and rejecting workplace disruption argument); see also Rankin, 483 U.S. at 388-89 (same); Grantham v. Trickey, 21 F.3d 289, 294 (8th Cir. 1994) (the Pickering balancing test is implicated when defendants present evidence that the speech activity had an adverse effect on the efficiency of the employer's operations).

It is true that police departments occupy a special category of government concerns; however, on the present record, Plaintiff's First Amendment interest in speaking in the context and circumstances of a campaign outweighs Defendant's interest in efficient public service.

### 3. Was the speech a substantial motivating factor?

To survive the summary judgment stage, Plaintiff must produce enough evidence for a reasonable jury to conclude that his protected speech was a substantial motivating factor in the City's decision to not promote and/or to effectively demote him. In this consideration, all reasonable inferences from the evidence must be made in favor of Plaintiff. See Jackson, 372 F.3d at 1280. "Purely circumstantial evidence, taken in the light most favorable to the plaintiff, can create a jury question on the issue of the government's motive." Beckwith, 58 F.3d at 1565.

Plaintiff has presented evidence that he campaigned for the political opponent of Mayor Poston, and that Mayor Poston and Chief Radzilowski knew of Plaintiff's political speech and campaign activities. (Dkt. 18, Poston at 5; Radzilowski at 19). Plaintiff also produced evidence that after the campaign, he was rejected for promotions on two occasions and reclassified from a Corporal to a Patrol Officer. (Dkt. 18, Harvey at 20, 56-57). Plaintiff offers evidence of statements by Chief Radzilowski from which a jury could reasonably infer that the Chief's decisions to not promote Plaintiff were based on Plaintiff's political speech. (Dkt. 18, Harvey at 90, 92).

This evidence is sufficient for a reasonable jury to conclude that Harvey's political speech was a substantial motivating factor in the City's decision to not promote or to reclassify him as a lower rank. Since there is a sufficient evidentiary basis for a reasonable jury to find for Plaintiff on this issue, summary judgment is inappropriate.

#### 4. Would the City have made the same decision?

Once Plaintiff has sufficiently shown that a reasonable jury could conclude that Defendant's decision was substantially motivated by retaliatory purposes, Defendant must "rebut this showing by convincing the jury, not the court, that a legitimate reason justified the decision." Beckwith, 58 F.3d at 1564. Defendant presents evidence that its rationale for not promoting Plaintiff was that Plaintiff did not support the philosophy of the department and the direction the Chief was taking the department. (Dkt. 15, Radzilowski at 26-27). Issues of motivation and discriminatory intent are questions of fact for the trier of fact. See generally Pullman-Standard v. Swint, 465 U.S. 273, 289-90 (1982); Beckwith, 58 F.3d at 1560. Defendant has demonstrated there exists a genuine issue of material fact as to Defendant's motivation for its decision to not promote and/or effectively demote Plaintiff; summary judgment on this issue is therefore inappropriate.

Upon consideration of Plaintiff's speech in light of the factors set forth in Bryson, Plaintiff has shown that he engaged in constitutionally protected speech. The discussion now turns to Defendant's argument that Plaintiff has not demonstrated that the City's actions were taken under the color of law.

### B. Actions Under Color of Law

Defendant asserts that Plaintiff does not identify any municipal policy or custom that led to his injury and therefore has not sufficiently supported his claim of a constitutional deprivation. (Dkt. 17 at 18). Municipalities such as Defendant may be held liable under § 1983 for constitutional violations resulting from the municipality's official policy statement, ordinance, regulation, or decision, or from a custom it maintains without formal approval. Monell v. Dept. of Social Services,

436 U.S. 658, 690-91 (1978). The entity may also be liable for the actions of an official "whose edicts or acts may fairly be said to represent official policy." Id. at 694.

Defendant argues that Harvey has not identified an official policy or well-settled custom or practice that caused his injuries because the decision to not promote Plaintiff was a single incident rather than an official policy or a repeated practice. (Dkt. 17 at 18).[9] Defendant cites the test laid out in Grech v. Clayton for establishing an "official policy," that a plaintiff may identify either: (1) an officially promulgated policy, or (2) an unofficial custom or practice shown through the repeated acts of a final policymaker. 335 F.3d 1326, 1329 (11th Cir. 2003).

However, a single decision by a municipal policymaker may constitute an official policy "where the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation." Board of County Commissioners v. Brown, 520 U.S. 397, 405 (1997).[10] The Brown Court explains that a single decision by city lawmakers can trigger municipal liability when the decision itself is the unconstitutional act. 520 U.S. at 406.

---

[9] Defendant devotes only a half page of its motion to this argument. As discussed hereafter, this issue cannot be resolved on the basis of the present record.

[10] Accord Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986) ("[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly"); Cooper v. Dillon, 403 F.3d 1208, 1221 (11th Cir. 2005) (municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances) (citing Pembaur, 475 U.S. at 480); Engelleiter v. Brevard County Sheriff's Dept., 290 F.Supp.2d 1300, 1309 (M.D. Fla. 2003) (single decision by decision-maker with final authority with respect to the action ordered may be a "policy or custom"); Corporation of the President of the Church of Jesus Christ of Latter Day Saints v. Environmental Protection Commission of Hillsborough County, 837 F.Supp. 413, 417 (M.D. Fla. 1993) (single action by an individual with policymaking authority may be an official policy under appropriate circumstances).

Here, Plaintiff alleges several single decisions to not promote Plaintiff, in December 2003 and again in June 2004. The decision to not promote Plaintiff is itself the unconstitutional retaliation alleged by Plaintiff, and thus may qualify as an official policy under Brown, so long as the decision to not promote Plaintiff was made by a final policymaker. See generally Quinn v. Monroe County, 330 F.3d 1320, 1325 (11th Cir. 2003) (municipal liability attaches in an employment decision when the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered).

Whether an official is one who possesses such "final policymaking authority" is a question of law. Jett v. Dallas Independent School Dist., 491 U.S. 701, 737 (1989). An official does not have final policymaking authority when their decisions are subject to meaningful administrative review. Scala v. City of Winter Park, 116 F.3d 1392, 1401 (11th Cir. 1997). For example, where a city manager's decision to hire or fire administrative personnel was completely insulated from review, the manager had final policymaking authority in this area. Martinez v. City of Opa-Locka, 971 F.2d 708, 713-15 (11th Cir. 1992). However, where a city police chief's employment decisions could be reversed by the city manager, the police chief was not considered the final policymaker. Hill v. Clifton, 74 F.3d 1150, 1152 (11th Cir. 1996).

Furthermore, whether a particular official has final policymaking authority is a question of state law. Jett, 491 U.S. at 737 (citing St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (plurality opinion)); Mandel v. Doe, 888 F.2d 783, 792 (11th Cir. 1989). The court should review state and local positive law, as well as custom or usage having the force of law, to identify those officials who have final policymaking authority for the actions alleged to have caused a constitutional violation. Jett, 491 U.S. at 737.

It is unclear from the evidence in the record who had final policymaking authority regarding promotions within the police department. Both Mayor Poston and Chief Radzilowski claim to be the final decisionmaking authority for promotions to sergeant. (Dkt. 18, Poston at 7; Radzilowski at 27). Mayor Poston asserts that he has the power to overrule Chief Radzilowski's recommendations for promotion, but admits that in the past he has not overruled a single recommendation made by Chief Radzilowski. (Dkt. 18, Poston at 7). Chief Radzilowski states that he does not know whether Mayor Poston has the authority to veto one of the Chief's selections for promotion. (Dkt. 18, Radzilowski at 28). But Chief Radzilowski contends that he has an agreement with Mayor Poston that he (Chief Radzilowski) runs the police department, and that Mayor Poston has not overturned decisions that the Mayor did not agree with because the Mayor knew it "would cost him a police chief." Id.

Common sense dictates that either Mayor Poston or Chief Radzilowski had final authority for promotions to sergeant, as Plaintiff argues.[11] However, there exist genuine issues of material fact on this issue and neither party has provided the relevant state or local law. Considering the evidence on the question of final policymaking authority in the light most favorable to Plaintiff precludes a finding for Defendant at this stage of the proceedings.[12]

---

[11]Plaintiff urges the court to accept both Mayor Poston and Chief Radzilowski as final policymakers with respect to police department promotions. (Dkt. 16 at 12; Dkt. 19 at 13-14). Because Mayor Poston is Chief Radzilowski's direct superior rather than a peer with equivalent authority, in this situation one or the other must be the final authority over promotions. Either the Mayor or the Chief had final approval over promotions; both cannot have final say.

[12]Additional briefing on the authority of Mayor Poston and Chief Radzilowski regarding police department promotions, and whether this authority was delegated, will be necessary prior to trial. See Praprotnik, 485 U.S. at 124.

Plaintiff has identified several single decisions that would qualify as official policy if made by an official with final policymaking authority. However, since the court cannot determine from the record who had final policymaking authority under state law for police department promotions, it is unclear that the alleged constitutional violations occurred under color of law. Defendant's argument for summary judgment on this issue is denied at this stage of the proceedings.

V.   **Conclusion**

It is **ORDERED AND ADJUDGED** that:

1) Plaintiff's Motion for Summary Judgment (Dkt. 16) is **DENIED**; and

2) Defendant's Motion for Summary Judgment (Dkt. 17) is **GRANTED** in part as to Plaintiff's claim of retaliation by denial of training requests, and **DENIED** in part as to all other respects.

**DONE AND ORDERED** in Tampa, Florida on this 22nd day of December, 2005.

_/s/ Elizabeth S. Jenkins_
ELIZABETH A JENKINS
United States Magistrate Judge

20